J. S63008/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | No. 2329 EDA 2015 |
| | : | |
| RISHAD WILLIAMS | : | |

Appeal from the Order, July 13, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. MC-51-CR-0038600-2014

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED SEPTEMBER 28, 2016**

The Commonwealth appeals from the July 13, 2015 order granting defendant/appellee, Rishad Williams' petition for writ of ***certiorari*** to the Court of Common Pleas and reversing his conviction.  We affirm.

The trial court has summarized the procedural and factual background of this matter as follows:

> On November 12, 2014, Appellee Rishad Williams was arrested and charged with Driving Under the Influence pursuant to 75 Pa.C.S. § 3802. On February 3, 2015, in the Municipal Court, Appellee argued a motion to suppress blood test results pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. On March 23, 2015, Municipal Court Judge Francis Shields denied the motion and found Appellee guilty after a bench trial.  On that date, Judge Shields sentenced Appellee to 72 hours to six months of confinement.  On May 19, 2015, Appellee filed a Writ

---

* Former Justice specially assigned to the Superior Court.

of Certiorari to Common Pleas Court. On July 13, 2015, this Court issued an Order granting Appellee's Writ of Certiorari, thereby reversing the denial of the suppression motion, vacating Appellee's sentence, and reversing his conviction. This Commonwealth appeal followed.[1]

Trial court opinion, 1/4/16 at 1.

At around 4:30 a.m. on November 12, 2014, James Brown was asleep in his home on Loretto Avenue in Philadelphia. Mr. Brown heard a loud noise and went to his window. He saw a motor vehicle and went outside. There, he saw three damaged vehicles; two were parked and one was in the street. Mr. Brown also saw Appellee standing next to the vehicle in the street. The two parked vehicles were not occupied. Mr. Brown watched Appellee get into the vehicle in the street and try to start it.

Police officers arrived at the scene fifteen minutes after Mr. Brown initially went outside. Officer Panarello spoke to Mr. Brown and Appellee at the scene. The officer observed that Appellee had watery, bloodshot eyes, slurred speech, and a moderate odor of alcohol on his breath, and that there were signs of a motor vehicle accident from debris in the road and damage to three vehicles. Officer Panarello took Appellee into custody because he believed Appellee was intoxicated and not able to operate a motor vehicle safely.

Appellee was transported to Frankford Hospital for chemical testing. There, at around 5:07 a.m., Lieutenant Jamil Taylor encountered Appellee. Appellee was handcuffed on a gurney and wearing a neck brace. He was sleeping and snoring loudly. When Lieutenant Taylor called Appellee's name, Appellee opened his eyes and immediately fell back

---

1 Pursuant to Pa.R.A.P. 311(d), the Commonwealth has certified in good faith that the trial court's order will terminate or substantially handicap the prosecution of this case.

to sleep. Thereafter, Lieutenant Taylor administered O'Connell warnings.[2] Appellee was asleep at this time. Lieutenant Taylor then instructed a nurse to take Appellee's blood. The nurse took Appellee's blood and gave it to Lieutenant Taylor. There was no search warrant prepared or executed prior to the blood draw. There is no evidence that Appellee ever consented to or refused the blood test.

*Id.* at 1-2 (citations to the transcript omitted).

The Commonwealth has raised the following issue for this court's review:

Did the lower court, sitting as an appellate court, err in reversing the denial of suppression of blood test evidence based on defendant's lack of affirmative consent notwithstanding the implied consent statute?

Commonwealth's brief at 4.[3]

The trial court relied on this court's decision in *Commonwealth v. Myers*, 118 A.3d 1122 (Pa.Super. 2015), *appeal granted*, 131 A.3d 480 (Pa. 2016), in which we held that the police were required to obtain a warrant before drawing blood from an unconscious DUI suspect, notwithstanding Pennsylvania's implied consent law. The trial court explained the rationale for its decision as follows:

---

[2] *See Com., Dept. of Transp., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873 (Pa. 1989).

[3] At the same time that the notice of appeal was filed, July 29, 2015, the Commonwealth filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), even though the trial court had not yet ordered it to do so. On January 4, 2016, the trial court issued an opinion in support of its decision.

Here, like Myers, Appellee was arrested for DUI pursuant to 75 Pa.C.S. § 3802. Lieutenant Taylor gave Appellee O'Connell warnings after he observed Appellee fall back to sleep. Similar to Myers, Appellee did not respond to the standard informed consent warnings. Although Appellee was not unconscious like Myers, he was sleeping and unresponsive at the time of the warnings and subsequent blood draw. Thus, Appellee did not consent to the blood test, nor was he able to refuse his consent to the test under Pennsylvania's implied consent statute, 75 Pa.C.S. § 1547.[4] Further, and

---

[4] The Pennsylvania implied consent statute reads, in pertinent part:

Any person who drives, operates, or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood . . . if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle: . . . in violation of section . . . 3802 (relating to driving under the influence of alcohol or controlled substance). . . .

75 Pa.C.S.A. § 1547(a)(1).

**(b)  Suspension for refusal.**--

(1)  If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person as follows. . . .

75 Pa.C.S.A. § 1547(b)(1).

(2)  It shall be the duty of the police officer to inform the person that:

> similar to the facts of **Myers**, Lieutenant Taylor did not obtain a warrant before requesting the blood draw. Instead, Lieutenant Taylor had the nurse perform a warrantless blood draw. Finally, no exigency appears on the record in the instant case that would justify a warrantless blood draw. Thus, based on **Myers** and the facts presented here, Appellee's blood was improperly obtained by the Commonwealth because Appellee was sleeping and did not consent to the test.

Trial court opinion, 1/4/16 at 5 (footnote omitted). **See also Bailey v. State**, ___ S.E.2d ___, 2016 WL 3751822 at *5 (Ga.Ct.App. July 13, 2016) ("Bailey's implied consent was insufficient to satisfy the Fourth Amendment, and he could not have given actual consent to the search and seizure of his blood and urine, as he was unconscious") (footnote omitted); **State v. Romano**, 785 S.E.2d 168 (N.C.Ct.App. April 19, 2016) (warrantless blood

---

> (i) the person's operating privilege will be suspended upon refusal to submit to chemical testing; and
>
> (ii) if the person refuses to submit to chemical testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties).

75 Pa.C.S.A. § 1547(b)(2).

draw of unconscious DWI defendant was unconstitutional despite North Carolina's implied consent law).[5]

The Commonwealth argues that **Myers** was wrongly decided and notes that the Pennsylvania Supreme Court has granted allowance of appeal in that case. (Commonwealth's brief at 17-18.) However, unless and until **Myers** is overturned by our supreme court, we remain bound by it. **See Commonwealth v. Reed**, 107 A.3d 137, 143 (Pa.Super. 2014) ("This Court is bound by existing precedent under the doctrine of **stare decisis** and continues to follow controlling precedent as long as the decision has not been overturned by our Supreme Court." (citations omitted; footnote omitted)). We agree with the trial court that **Myers** is controlling here.[6]

The Commonwealth also argues that the good-faith exception to the exclusionary rule should apply, where appellee was arrested prior to this court's decision in **Myers**. However, the basis for our holding in **Myers** was the United States Supreme Court's decision in **Missouri v. McNeely**, ___

---

[5] Although not binding precedent, out-of-state decisions may be relied upon as persuasive authority. **Trach v. Fellin**, 817 A.2d 1102, 1115 (Pa.Super. 2003) (**en banc**), **appeal denied**, 847 A.2d 1288 (Pa. 2004) (citations omitted).

[6] We recognize that in **Myers**, the defendant was unconscious due to the hospital's administration of Haldol a few minutes before the officer arrived. **Myers**, 118 A.3d at 1124. Here, appellee was asleep or passed out, apparently due to intoxication. The Commonwealth does not dispute that appellee was unresponsive. The bottom line is that neither the defendant in **Myers** nor appellee in this case was able to exercise his statutory right of refusal to blood testing under 75 Pa.C.S.A. § 1547(b)(1).

U.S. ___, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), which predated appellee's arrest. In **McNeely**, a blood sample had been taken from the suspect, despite his refusal to submit to such testing. The **McNeely** Court ruled that, "[i]n those driving situations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." **Id.** at 1561. **McNeely** rejected a **per se** rule allowing the involuntary taking of a person's blood when there is probable cause to believe he committed a drunk driving offense. **Id.** Rather, whether a warrantless blood draw is reasonable must be determined on a case-by-case basis, considering the totality of the circumstances. **Id.** at 1563. **See also Bailey**, 2016 WL 3751822 at *4 ("courts from other jurisdictions generally have found that, under **McNeely**, implied consent of an unconscious suspect is insufficient to satisfy the Fourth Amendment. Those states have concluded that the State must either obtain a warrant or show exigent circumstances for a warrantless search under the totality of the circumstances.") (footnote omitted) (collecting cases); **Romano**, 785 S.E.2d at 174-175 (holding that the officers could not reasonably rely on the good faith exception to the exclusionary rule where they never attempted to obtain a warrant).

In its reply brief, the Commonwealth asserts that the recent case of **Birchfield v. North Dakota**, ___ U.S. ___, 136 S.Ct. 2160, 84 USLW 4493

(June 23, 2016), dictates a contrary result. We disagree. **Birchfield** held that a blood test, as opposed to a breath test, may not be administered as a search incident to a lawful arrest for drunk driving:

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at 2184-2185. **Birchfield** rejected the respondents' alternative argument that such tests are justified based on the driver's legally implied consent to submit to them, stating that,

> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

*Id.* at 2185. It is true, as the Commonwealth points out, that the state statutes at issue in **Birchfield**, unlike Pennsylvania's implied consent law, went further than imposing civil penalties and evidentiary consequences on drivers who refused to comply and imposed criminal penalties:

> Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them.

*Id.* However, **Birchfield** did not address the issue presented here and in **Myers**, the constitutionality of taking blood from an unconscious suspect who is unable to refuse consent. North Dakota's implied consent law made refusal a misdemeanor. *Id.* at 2186. The Court in **Birchfield** concluded that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Id.* The Commonwealth's argument that the United States Supreme Court would have reached a different conclusion if North Dakota's implied consent law had not imposed criminal penalties for refusal is speculation. As such, the Commonwealth's reliance on **Birchfield** is misplaced. As discussed above, **Myers** dictates the result here.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/28/2016